UNITED FARM BUREAU FAMILY LIFE INSURANCE COMPANY *v.* CHRIS FULTZ, ROBERT FULTZ, JR., JOHN RAY FULTZ, LEON FULTZ, C. THOMAS CONE, GUARDIAN AD LITEM OF ROBERT FULTZ, JR., AND JOHN RAY FULTZ

[No. 1-277A25. Filed April 25, 1978. Rehearing denied June 1, 1978. Transfer denied August 29, 1978.]

*Frank E. Spencer*, of Indianapolis, *George W. Hand, Scotten & Hinshaw*, of New Castle, *Stephen A. Free, Ging, Free & Brand*, of Greenfield, *Thomas L. Clagg*, of Ft. Wayne, *William M. Evans, Bose, McKinney & Evans*, of Indianapolis, for appellant.

*E. Edward Dunsmore*, of Knightstown, *James R. White, R. Clark Allen*, of New Castle, for appellees.

## STATEMENT OF THE CASE

LYBROOK, P.J. — Defendant-appellant United Farm Bureau Family Life Insurance Company (Farm Bureau) appeals from a judgment in favor of plaintiff-appellee Chris Fultz (Chris), who was awarded punitive damages in an action to recover benefits under an insurance policy.

## FACTS

Robert Fultz (Robert), the husband of Chris Fultz, was insured under a $30,000 ten year decreasing term life insurance policy, which had been issued by Farm Bureau. On July 5, 1973, at approximately 2:00 a.m., Robert was mysteriously shot and killed as he slept on the sofa in the front room of the trailer in which he and Chris were living. After Robert's funeral, Chris, who was the beneficiary of Robert's Farm Bureau life insurance policy, sought to collect the proceeds of that policy.

Before Farm Bureau had acted upon her application for the proceeds, Chris, who said that she had been sleeping in the bedroom when she was awakened by the shot that killed Robert, was, neverthless, indicted and tried for Robert's murder. When her trial ended in acquittal in November, 1973, Chris again sought to collect the proceeds of Robert's life insurance policy.

Farm Bureau, upon the advice of its counsel, told Chris, in effect, that her acquittal of the criminal charge was not dispositive of the issue

of the proper beneficiary to receive the proceeds of the life insurance policy. Farm Bureau explained to Chris that Robert had designated his estate, which included Robert's three sons, Robert, Jr., John, and Leon, to be an alternate beneficiary of the life insurance policy, if for some reason Chris was not eligible to be a beneficiary under the policy. Farm Bureau told Chris that it could not pay the proceeds of the policy to her as long as the possibility existed that she was an ineligible beneficiary and that Robert's estate was the proper beneficiary of the policy.

On January 28, 1974, Chris brought an action against Farm Bureau to recover the proceeds of the insurance policy and to recover punitive damages for, as Chris alleged, Farm Bureau's bad faith refusal to pay her the proceeds of the policy after she had been acquitted of Robert's murder. In its answer Farm Bureau tendered the face amount of the policy to the court, and requested that Robert's estate and Robert's statutory heirs, Robert Fultz, Jr., John Ray Fultz, and Leon Fultz be made cross party defendants; and, pursuant to Ind. Rules of Procedure, Trial Rule 22, Farm Bureau sought interpleader so that Chris and Robert's estate could litigate the issue of which beneficiary was eligible to receive the proceeds of the life insurance policy. Interpleader was granted, but neither the personal representative of the estate nor Leon Fultz made appearances in the action. A guardian ad litem[1] appeared in the action to represent the interest of Robert, Jr. and John. Farm Bureau was not permitted to withdraw from the action even though it had tendered the face amount of the policy for the reason that certain issues concerning punitive damages and the payment of additional interest were raised in Chris' complaint.

Farm Bureau made a motion to dismiss the portion of Chris' complaint which sought punitive damages contending the complaint failed

---

1. At the commencement of the action in the case at bar, Chris was appointed the guardian ad litem of Robert Fultz, Jr. and John Ray Fultz. Later in the proceedings, but before trial, the trial court determined that Chris, as guardian ad litem, could not adequately protect the interests of Robert, Jr. and John because of her conflict of interest. Therefore, the Court appointed a disinterested party to be the guardian ad litem for Robert, Jr. and John in Chris' place. It was not until this subsequent guardian ad litem was appointed that Robert, Jr. and John appeared in the action and made a claim for the proceeds of Robert's insurance policy.

to state a claim upon which punitive damages could have been awarded. Chris sought to amend her complaint and was permitted to do so in order to include specific allegations of fraudulent, malicious, and oppressive activity on the part of Farm Bureau. Farm Bureau filed a motion to strike paragraph II of Chris' amended complaint alleging that it was insufficient to raise the question of fraudulent activity on the part of Farm Bureau. The court sustained Farm Bureau's motion to strike.

By motion Chris requested the court to reconsider its ruling on Farm Bureau's motion to strike paragraph II of Chris' amended complaint. The court reconsidered and changed its prior ruling by overruling Farm Bureau's motion to strike paragraph II of Chris' amended complaint. Farm Bureau again moved for dismissal, pursuant to Ind. Rules of Procedure, Trial Rule 12(B)(6). A hearing was held and Farm Bureau's motion was denied.

A trial by jury was held on August 30, 1976. At the close of Chris' evidence Farm Bureau filed a motion for judgment on the evidence, seeking to have the question of punitive damages removed from the jury's consideration. Such motion was overruled. Farm Bureau renewed its motion for judgment on the evidence at the close of all the evidence, and, again, such motion was overruled.

The jury found for Chris and awarded her actual damages of $20,784 plus 8% interest and punitive damages of $15,000. The trial court entered judgment in accordance with the jury's verdict and ordered Farm Bureau to pay the costs of the action and to pay for the services (including attorney fees) of the guardian ad litem for Robert Fultz, Jr. and John Ray Fultz who had been brought into the action by Farm Bureau's request for interpleader.

## *ISSUES*

The issues raised for our consideration are as follows:

(1)  Whether the court erred in reinstating paragraph II of Chris' amended complaint, such reinstatement in substance allowing the issue of punitive damages to be tried.

(2)  Whether the court erred in overruling Farm Bureau's motion to dismiss and thereby keeping Farm Bureau in the case even

though the policy proceeds and some interest in the amount of $21,245.58 had been paid into the court, all of the persons who might have a claim or interest in the proceeds of the policy allegedly had been joined as parties, and Farm Bureau allegedly had no further interest in the cause.

(3) Whether the court erred in overruling Farm Bureau's motion for judgment on the evidence when it was renewed at the close of all the evidence for the reason that there was no evidence that Farm Bureau had been guilty of willful, malicious, oppressive or grossly fraudulent conduct, evidencing a wanton disregard of the rights of others or heedless disregard of the consequences.

(4) Whether the court erred in overruling the objection of Farm Bureau and permitting a witness to testify as to the net worth of Farm Bureau, the objection being made on the ground that there was no evidence with respect to the subject of punitive damages.

(5) Whether the court erred in refusing to give Farm Bureau's tendered Instructions No. 2, 3 and 6, which would have removed the issue of punitive damages from the jury.

(6) Whether the court erred in refusing to give Farm Bureau's tendered Instructions No. 4 and 8 and giving in their place the court's own Instruction No. 8, which, although it contained the same elements as those found in Instruction 4 and 8 tendered by Farm Bureau, also instructed the jury that Farm Bureau had the burden of proving that Chris had wrongfully and intentionally killed Robert.

(7) Whether the court erred in giving Plaintiff's Instruction No. 5, over objection, the instruction allowing the jury to award interest from the date of the claim made until the present, at 8% per year, the objection being that there is no statutory authority for payment of such interest.

(8) Whether the verdict as to computation and allowance of 8% interest from the date of claim, and allowance of punitive damages, was supported by sufficient evidence, and whether the verdict was contrary to law in that the damages were excessive.

(9) Whether the court erred in ordering Farm Bureau to pay,

as costs of this action, the sum of $1,600 to the guardian ad litem for his services in representing Robert Fultz, Jr. and John Ray Fultz, the minor children of Robert and Chris Fultz.

## DISCUSSION AND DECISION

*Issues One and Two*

Farm Bureau contends that the trial court erred in reinstating the request for punitive damages contained in paragraph II of Chris' amended complaint upon Chris' motion to reconsider Farm Bureau's motion to strike. In reinstating paragraph II of Chris' amended complaint the trial court pointed out that an allegation in a complaint which adequately notifies the other party of the plaintiff's claim for relief is sufficient to withstand a motion to dismiss or a motion to strike under Ind. Rules of Procedure, Trial Rule 12. In *McCarthy v. McCarthy* (1971), 150 Ind. App. 640, 276 N.E.2d 891, 895, this court stated the following:

> ". . . Our adoption of notice pleading under Indiana Rules of Trial Procedure contemplates that a complaint need not state a detailed cause of action alleging such specific facts as performance of all the myriad terms and conditions of a settlement agreement. The framers of the new rules went to great pains to circumscribe this practice of paper inundation and have adopted a compact and uncomplicated form of pleading which requires a plaintiff merely to make a clear and concise statement in order to put the defendant on notice that plaintiff has a justiciable claim and is entitled to relief under some legal theory. Trial Rule 8(A); *Farm Bureau Insurance Co. v. Clinton* (1971), [149] Ind. App. [36], 269 N.E.2d 780, 782. No more is required to withstand a motion to dismiss under Trial Rule 12(B)(6). . . ."

Our Supreme Court in *State v. Rankin* (1973), 260 Ind. 228, 294 N.E.2d 604, 606, further clarified the method whereby the sufficiency of one or more allegations in a complaint is challenged when it stated:

> "This Court has noted that in a typical 12(B)(6) situation, a complaint is not subject to dismissal unless it *appears to a certainty* that the plaintiff would not be entitled to relief under *any set of facts. Sacks v. American Fletcher National Bank and Trust Co.* (1972), [258] Ind. [189], 279 N.E.2d 807. See also *Gladis v. Melloh* (1971), [149] Ind. App. [466], 273 N.E.2d 767; *Wyant v. Lobdell* (1972),

[150] Ind. App. [675], 277 N.E.2d 595. The rules do *not* require that the complaint state all the elements of a cause of action. It must be remembered that our new rules are based on so-called notice pleadings in which a plaintiff essentially need only plead the operative facts involved in the litigation. Other means less drastic than dismissal of the action can be used to clarify the theory and basis for the cause of action. Among these are a Motion for a more definite statement under TR. 12(E), our very broad discovery rules, and the pre-trial conference under TR. 16(A)(1). We might note that certain cases from the Court of Appeals apparently state that the plaintiff is required to state in his complaint the theory upon which his claim is based. See, for instance, *Cheathem v. City of Evansville* (1972), [151] Ind. App. [181], 278 N.E.2d 602. Although a statement of the theory may be highly desirable, it is not required. When no evidence has been heard or no affidavits have been submitted, a 12(B)(6) motion should be granted only where it is clear from the face of the complaint that under no circumstances could relief be granted." (Original emphasis.)

In the case at bar Chris' amended complaint alleged that Farm Bureau's failure to examine the court records of Chris' criminal trial and its failure to pay the proceeds of Robert's life insurance policy to Chris upon her demand amounted to malicious and oppressive conduct on the part of Farm Bureau. The amended complaint, therefore, gave notice to Farm Bureau that Chris was seeking punitive damages based on Farm Bureau's allegedly malicious and oppressive conduct evidenced by Farm Bureau's refusal to pay Chris the proceeds of Robert's life insurance policy. Such a claim for relief is sufficient to withstand a motion to dismiss which is unsupported by material extrinsic to the pleadings or a motion to strike which addresses itself to the sufficiency of the claim.[2] Therefore, the trial court did not err in overruling Farm Bureau's motion to strike and in reinstating paragraph II of Chris' amended complaint, nor did the trial court err in overruling Farm Bureau's first motion to dismiss pursuant to TR.

---

2. Punitive damages may be awarded in an action on a contract where there is proof of fraudulent, malicious, or oppressive conduct which is tortious in nature and which is not just a simple breach. See *Vernon Fire and Casualty Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, and *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845. Therefore, by alleging that Farm Bureau engaged in conduct which was fraudulent, malicious, or oppressive, Chris' allegation was a legally sufficient claim for relief.

12(B)(6), because such motion was based solely upon the pleadings and was unsupported by affidavits or a presentation of evidence at a hearing. We also hold that the trial court, after hearing evidence on Farm Bureau's second motion to dismiss pursuant to TR. 12(B)(6), did not err in overruling such motion.

Ind. Rules of Procedure, Trial Rule 12(B) states in part:

> "If, on a motion, asserting the defense number (6), to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. In such case, all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

Ind. Rules of Procedure, Trial Rule 56(C) states in part:

> ". . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits and testimony, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ."

Since the trial court held an evidentiary hearing on Farm Bureau's second motion to dismiss and considered matters outside the pleadings, the trial court was required by TR. 12(B) to treat such motion as a motion for summary judgment. Accordingly to TR. 56(C), before the trial court could grant summary judgment in favor of either party it had to find that there was no genuine issue as to any material fact.

Farm Bureau contends that an examination of all the evidence presented at the hearing reveals that no genuine issue of material fact existed, and that the trial court erred in not granting summary judgment in favor of Farm Bureau. The record does not contain a transcript of evidence from the hearing which was held concerning Farm Bureau's second motion to dismiss. Because Farm Bureau has failed to preserve its record in this matter, Farm Bureau has waived any error which may have been committed in ruling upon Farm Bureau's second motion to dismiss.[3]

---

3. In *Kerkhof v. Dependable Delivery, Inc.* (1975), 167 Ind. App. 248, 338 N.E.2d 513, this court stated:

*Issue Three*

Farm Bureau contends that the trial court erred in denying Farm Bureau's motion for judgment on the evidence made at the close of all the evidence for the reason that there was no evidence presented during trial which would support an award of punitive damages by the jury.

Farm Bureau contends that it was justified by the circumstances in not paying the proceeds of the policy to Chris when she first made application to receive such proceeds in July, 1973. We agree that Farm Bureau was justified in not paying Chris at that time because Chris was suspected of having murdered Robert. If Chris had, indeed, wrongfully and intentionally killed Robert she would have been ineligible to receive the proceeds as the primary beneficiary of Robert's life insurance policy for the reason that the law will not permit a wrongdoer to profit from his or her wrong.[4] If Farm Bureau had paid the proceeds to Chris at that time, and if, in fact, Chris had been ineligible to receive such proceeds, then Robert's estate, the secondary beneficiary of his life insurance policy, could have attempted to collect the amount of the proceeds from Farm Bureau, and, thus, subjected Farm Bureau to multiple litigation and to possible multiple liability.[5]

---

"It is basic and fundamental that an appellant has the burden to provide the reviewing court with a record sufficient to permit consideration of the claimed error or errors.

Since the record filed herein by the appellants does not support the claimed error . . . , nothing is presented to us for review on this point." (Citations omitted.)

4. See *Beene v. Gibraltar Industrial Life Ins. Co.* (1945), 116 Ind. App. 290, 63 N.E.2d 299.

5. See TR. 22 and 2 Harvey, Ind. Prac., Rules of Civil Proc. Anno. 319-320 (1970), where the following comments are made concerning Fed. Rules of Civil Procedure, Rule 22, which is essentially identical to Ind. TR. 22:

"The purpose of interpleader is to prevent the vexation of a multiplicity of actions and to prevent one creditor from obtaining the advantage of first obtaining a judgment. *Maryland Casualty Co. v. Glassel-Taylor & Robinson*, C.C.A.5th, 1946, 156 F.2d 519. The multiple claims need not be meritorious; the threat of litigation is sufficient. *A/S Krediit Pank v. Chase Manhattan Bank*, D.C.N.Y. 1957, 155 F. Supp. 30. The remedy is equitable in nature. *Bynum v. Prudential Life Ins. Co. of America*, D.C.S.C. 1947, 7 F.R.D. 585. . . .

\* \* \* \*

"A defendant threatened with multiple liability may have interpleader by cross-claim or counterclaim. *Harris v. Travelers Ins. Co.*, D.C. Pa. 1941, 40 F. Supp. 154.

Chris contends that, assuming *arguendo* Farm Bureau was justified in withholding the proceeds while she was being tried for murder, her acquittal in the criminal trial would be dispositive of any claim in a civil trial that she had wrongfully and intentionally killed Robert. Therefore, Chris contends that Farm Bureau should have paid her the proceeds immediately after her acquittal, and that Farm Bureau's refusal to pay her at that time was in bad faith and amounted to fraudulent and oppressive conduct. We do not agree with Chris' contention, because acquittal in a criminal trial does not render an issue of civil liability *res judicata.*[6] Therefore, Farm Bureau properly sought interpleader, pursuant to TR. 22, by tendering the face amount of the policy and by seeking to have the potential claimants brought into the action as cross-party defendants.

However, even though Farm Bureau was justified in not paying Chris until it was established that she had the right to receive the proceeds, the question arises as to whether there was, nevertheless, evidence presented at trial upon which the jury could have relied in awarding punitive damages.

Robert Fultz was killed on July 5, 1973. After suicide had been excluded as the cause of Robert's death, Farm Bureau knew that it owed the proceeds to either Chris, the primary beneficiary, or to Robert's estate, the secondary beneficiary. The question arises as to whether Farm Bureau's delay in seeking interpleader was evidence from which bad faith or fraudulent and oppressive conduct could have been inferred.

While the exact basis for punitive damages, when related to an action on a contract, is somewhat uncertain, we can find no evidence in the case at bar which would support the verdict of the jury under either of the possible guidelines expressed by the Indiana Supreme Court. In *Vernon Fire & Casualty Insurance Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173, the court appeared to dispense with the requirement of an independent tort for allowance

He may also interplead third parties. *Home Ins. Co. of N.Y. v. Kirkevold*, C.C.A.9th, 1947, 160 F.2d 938. . . ."

6.  See *Beene v. Gibraltar, supra*; and *National City Bank of Evansville v. Bledsoe* (1957), 237 Ind. 130, 144 N.E.2d 710 at footnote 15 on page 715.

of punitive damages, when the public interest would be served to prevent future similar misconduct by the party being punished. That court in *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845, emphasized that *Vernon, supra,* was an exception to the normal requirement of the establishment of the elements of a common law tort, that exception being "whenever the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy." (Emphasis added.) The court went on to state that the public interest must be served by the deterrent effect of the punitive damages before the requirement of an independent tort can be lessened.

Under either standard, the evidence in the case at bar fails to reveal any inference of fraud, malice, gross negligence, oppression, or bad faith. A comprehensive list of the events in this case sheds light on the actions of Farm Bureau:

July 5, 1973—Robert Fultz was murdered.

July 11, 1973—Chris Fultz contacted the insurer.

August 3, 1973—Chris Fultz was indicted by the Grand Jury for the murder of Robert Fultz.

November 13, 1973—The murder trial of Chris Fultz began.

November 22, 1973—Chris Fultz was acquitted of murder.

December 27, 1973—Farm Bureau sent a letter to George W. Hand (its local attorney in the case) stating that:

. (1) it had investigated the matter; (2) it had been contacted by deceased's family and might be sued by them; (3) that legal research indicated that the question of the proper beneficiary was not *res judicata* as a result of the criminal acquittal; (4) that a conflict of interest might exist for attorney James R. White as he represented both Chris Fultz and the estate (which was to receive the proceeds should Chris be found not entitled thereto); (5) that minor children were involved as heirs; and (6) the only safe course of action would be to seek an interpleader (either by way of answer to a complaint or through affirmative action). The letter included a check for the sum of $21,245.58 payable to the Clerk of the Henry Circuit Court. (The above amount included interest from the time of the claim until January 1, 1974).

January, 1974—(exact date unknown) George Hand contacted

James R. White (Chris' attorney) in regard to dispersing the money.

January 28, 1974 — Chris Fultz filed suit requesting punitive damages.

March 1, 1974 — Farm Bureau answered.

March 11, 1974 — Farm Bureau tendered payment to the court and attempted to withdraw from the case.

The sole basis for finding evidence to support the punitive damages award must be the purported delay in seeking interpleader. However, if any delay can be found, it must be calculated from the time of Chris Fultz' acquittal (November 22, 1973) until the filing of suit (January 28, 1974). This period of slightly over two months was more than reasonable considering the complexity of the law in regard to the payment of murder related life insurance proceeds, especially in light of the fact that negotiations were proceeding in an attempt to settle the matter.

The imposition of punitive damages would in effect require the insurer to immediately file an interpleader when learning that the decedent was murdered. That would no doubt have been followed by a continuance until the criminal proceedings ended. At that time the civil action could continue.

The record reveals no evidence of an independent tort separate from the contract. The record further reveals no evidence of "a mingling of fraud, malice, gross negligence or oppression in the controversy." Therefore, Farm Bureau's motion for judgment on the evidence as to the punitive damages issue should have been granted. We therefore reverse the allowance of punitive damages and the submission of the issue to the jury.

*Issue Four*

Farm Bureau contends that the trial court erred in allowing certain evidence of Farm Bureau's net worth to be admitted into evidence on the ground that there was no evidence with respect to punitive damages, and that therefore, Farm Bureau's net worth was irrelevant to the case being tried.

Due to our resolution of issue three we deem it unnecessary to discuss this matter.

*Issue Five*

Farm Bureau has waived this issue by its failure to provide this court with succinct argument or citations of authority germane to this issue. See Ind. Rules of Procedure, Appellate Rule 8.3(A)(7).

However, even had Farm Bureau not waived this issue, our resolution of issue three would be dispositive of this alleged error.

*Issue Six*

Farm Bureau contends that the trial court erred in refusing to give Farm Bureau's tendered Instructions No. 4 and 8 and giving in their place the court's own Instruction No. 8, which, although it contained the same elements as those found in Instructions No. 4 and 8 tendered by Farm Bureau, also instructed the jury that Farm Bureau had the burden of proving that Chris had wrongfully and intentionally killed Robert.

Farm Bureau has admitted that the court's Instruction No. 8 contains the same elements as Farm Bureau's tendered Instructions No. 4 and 5. Therefore, if the court's Instruction No. 8 is correct, then the court did not err in refusing Farm Bureau's tendered Instructions No. 4 and 8. See *Ashton v. Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210.

Farm Bureau has waived any error which the court may have committed in giving the court's Instruction No. 8 because of Farm Bureau's failure to object to such instruction at trial. See Indiana Rules of Procedure, Trial Rule 51(C) and *Weenig v. Wood* (1976), 169 Ind. App. 413, 349 N.E.2d 235. The purpose which underlies the rule requiring a party to object to an erroneous instruction is to point out the error to the court so that the court has the opportunity to correct the error and, thereby, avoid the necessity of having another trial. See *Love v. Harris* (1957), 127 Ind. App. 505, 143 N.E.2d 450.

In the case at bar Farm Bureau's failure to object to the court's Instruction No. 8 precluded the court from having the opportunity to correct an instruction which may have been erroneous.

Farm Bureau contends that, although it failed to object to the court's Instruction No. 8, the shifting of the burden of proving that Chris wrongfully and intentionally killed Robert from interpleaded cross-party defendants, Robert Jr. and John, to Farm Bureau clearly deprived Farm Bureau of a fair trial and due process of law, and that such deprivation of due process constituted fundamental error, which error can be raised on appeal without first having objected at trial.

Concerning fundamental error our Supreme Court in *Malo v. State* (1977), 266 Ind. 157, 361 N.E.2d 1201, 1204-5, states the following:

"Defendant correctly asserts that fundamental error is an exception to the rules requiring proper in-trial objection as a prerequisite to raising the issue on appeal, citing *Kleinrichert v. State* (1973), 260 Ind. 537, 297 N.E.2d 822. That the error complained of relates to the violation of a right guaranteed by the constitution does not, in and of itself, render it fundamental error requiring us to go against well established rules of procedure. Rather, fundamental error is error which if not rectified, would deny the appellant 'fundamental due process.' *Webb v. State* (1972), 259 Ind. 101, 284 N.E.2d 812."

Farm Bureau contends that the error contained in the court's Instruction No. 8 was so prejudicial to Farm Bureau's case that Farm Bureau was denied a fair trial. Farm Bureau misconstrues the meaning of fundamental error. Fundamental error is not synonymous with prejudicial error. It is correct to say that fundamental error is always prejudicial or harmful error, but prejudicial error is not always fundamental error. If it were, then every time an error was committed which was prejudicial to a party's case, that party could raise such error for the first time on appeal without having made any effort to object at trial. As a result the trial court would not have had an opportunity to correct the error before judgment was entered. A rule of law which equates fundamental error with prejudicial error would place an unduly heavy burden upon trial court judges and would give generous accommodation to lazy or incompetent lawyers.

Fundamental or plain error results only where a statement is made or an act is done which results in prejudicial error that goes to the

very heart of a party's case and where that statement or act is wholly outside of the preventive or corrective powers of that party.

The error complained of by Farm Bureau was not fundamental error because it could easily have been corrected or, at least, preserved for appeal, if Farm Bureau had made a timely objection. Farm Bureau has not asserted general incompetence on the part of its counsel at trial, and since no objection was made at trial, Farm Bureau has preserved no error for this court to review.

*Issue Seven*

Farm Bureau contends that the trial court erred in giving plaintiff's Instruction No. 5, which allowed the jury to award prejudgment interest from the date of the claim to the time of judgment. Farm Bureau contends that there is no statutory authority which empowers a jury to award prejudgment interest. We disagree.

IC 1971, 24-4.6-1-103 (Burns Code Ed., Supp. 1977) states as follows:

". . . Interest at the rate of eight per cent [8%] per annum shall be allowed:

(a) From the date of settlement on money due on any instrument in writing which does not specify a rate of interest and which is not covered by IC 1971, 24-4.5 [24-4.5-1-101 — 24-4.5-6-203] or this article [24-4.6-1-101 — 24-4.6-1-202];

(b) And from the date an itemized bill shall have been rendered and payment demanded on an account stated, account closed or for money had and received for the use of another and retained without his consent. [IC 1971, 24-4.6-1-103, as added by Acts 1974, P.L. 115, § 2, p. 468.]"

Concerning IC 24-4.6-1-103, *supra*, this court in *Indiana Telephone Corporation v. Indiana Bell Telephone Company, Inc.* (1976), 171 Ind. App. 616, 358 N.E.2d 218, said:

"ITC contests the application of this section on the basis that it pertains to 'liquidated claims, while this case involves the discovery of alleged indebtedness arising from a disputed claim.' We must decline to agree since Indiana authority sufficiently amplifies that the crucial factor in allowing interest is whether

the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation, not whether damages were liquidated. *New York, Chicago & St. Louis Railway Co. v. Roper* (1911), 176 Ind. 497, 506, 96 N.E. 468; *Hirsch v. Merchants Nat'l Bank & Trust Co. of Indiana* (1975), [166] Ind. App. [497], 336 N.E.2d 833, 838; *Portgage Indiana School Construction Corp. v. A.V. Stackhouse Co.* (1972), 153 Ind. App. 366, 287 N.E.2d 564, 567.

Where the terms of the contract make the claim ascertainable and the amount of the claim rests upon mere computation, pre-judgment interest computed from the time the principal amount was demanded or due is allowable at the permissible statutory rate, in the absence of an express contractual provision specifying the interest rate. *Independent Five & Ten Cent Store v. Heller* (1920), 189 Ind. 554, 561, 127 N.E. 439; *City of Vincennes v. McCarter* (1968), 142 Ind. App. 493, 236 N.E.2d 76, 77, *Kuhn v. Powell* (1915), 61 Ind. App. 131, 133, 111 N.E. 639."

In the case at bar the insurance contract between Robert and Farm Bureau gave Chris certain third party benefits upon the happening of a certain contingency, that is, Robert's death. When Robert died and Chris made application for the proceeds, the amount of the proceeds became due and owing to the proper beneficiary. Even though the proper beneficiary could not be determined at the time of Chris' demand, the proceeds of the policy nevertheless became due and owing to someone. By retaining possession of the funds Farm Bureau brought into play the above mentioned statute.

According to IC 24-4.6-1-103, *supra*, interest at the rate of eight per cent per annum was properly assessed until the proceeds of the policy had actually been paid either to Chris or to the court in an interpleader action.[7] Therefore, the court erred to the extent that it calculated the amount of prejudgment interest owed by Farm Bureau as beginning to accrue from the date of Chris' claim and continuing to the date of judgment; it should have calculated the prejudgment interest from the date of Chris' original claim in July, 1973, to the time when Farm Bureau actually tendered the money into court as a part of its request for interpleader.

---

7. See also *Murphy v. Travelers Ins. Co.*, 534 F.2d 1155 (5th Cir., 1976).

*Issue Eight*

Farm Bureau contends that the verdict as to the allowance and computation of 8% interest from the date of the claim, and allowance of punitive damages was not supported by sufficient evidence and that the verdict was contrary to law in that the damages were excessive.

As discussed above the allowance of 8% interest was supported by sufficient evidence, but the prejudgment interest was computed incorrectly. The court should have calculated the interest from the date that the proceeds became due to the time when Farm Bureau tendered the proceeds as a part of its request for interpleader.

In light of our disposition of the punitive damages issue above, the sufficiency of the evidence and excessive damages questions become moot and we will not discuss them here.

*Issue Nine*

Farm Bureau contends that the trial court erred in ordering Farm Bureau to pay, as costs of this action, the sum of $1,600 to the guardian *ad litem* for his services in representing Robert Fultz, Jr. and John Ray Fultz, the children of Robert and Chris Fultz. We agree.

Farm Bureau was entitled to seek interpleader after Chris brought suit against Farm Bureau. It was necessary for the trial court to appoint a guardian *ad litem* in order to properly dispose of the legal controversy in the case at bar. In *State ex rel. Keating v. Bingham, Judge* (1954), 233 Ind. 504, 121 N.E.2d 727, 730, our Supreme Court said:

" 'A "guardian ad litem" is one appointed by a court in which particular litigation is pending, to represent a ward or an unborn person in that particular litigation.' . . .

\* \* \*

"The compensation of a guardian *ad litem* for services rendered may be allowed as an expense of administration, or out of the ward's interest in the proceedings in such amount as the court within its discretion shall determine. . . .

\* \* \*

". . . [A guardian *ad litem*] is not in the position of an attorney, rendering services to a guardian. . . . He is not a party to the main

action but is an officer of the court brought into the case by the appointment and order of the court, and the services which he has rendered were pursuant to the duty imposed upon him by the court. . . ." (Citations omitted.)

As our Supreme Court points out in *State ex rel. Keating, supra,* a guardian *ad litem* is appointed by the court to represent the interests of a minor or incompetent ward in certain legal proceedings. Most of the statutes and cases which discuss the compensation of a guardian *ad litem* involve probate law and the administration of estates pursuant thereto.[8]

The probate laws empower the trial court to compensate a guardian *ad litem* for his services either from the estate *in toto* or from the ward's interest in the estate. Therefore, it follows that if the result of the litigation reveals that the ward does not in fact have a valid claim upon any part of the estate, the trial court in its discretion is still empowered to compensate the guardian *ad litem* for his services from the body of the estate. The policy reason behind such is to ensure that an officer of the court, who has been appointed by the court, will not have to render services without compensation.

In the case at bar the core of the litigation is not an estate but rather proceeds from an insurance policy. If we analogize from the probate law, the insurance proceeds would be analogous to the estate, and the fee of the guardian *ad litem* should be extracted from the proceeds. Our legislature appears to have intended that, where the ward recovers nothing, the fee of the guardian *ad litem* be taken from the core of the litigation, such as the insurance proceeds, and not from a nonprevailing party, such as Farm Bureau. Therefore, we hold that the fee of the guardian *ad litem,* in this case, should be taken from the proceeds of the policy.

The trial judge is ordered and directed, upon receipt of an official copy of this opinion from the Clerk of this Court, to amend the judgment heretofore entered of record in this cause as follows, to-wit:

---

8. See IC 1971, 29-1-1-20 (Burns Code Ed.), IC 1971, 29-1-18-1 (Burns Code Ed. Supp. 1977), and IC 1971, 29-1-18-45 (Burns Code Ed.). See also *State ex rel. Keating, supra.*

1. Recalculate the amount of interest due Chris as determined by this Court under issue No. 7 of this opinion.

2. Delete the charge of the guardian *ad litem's* fee as charged to Farm Bureau and assess the same against the award to Chris as determined under issue No. 9 of this opinion.

3. Delete from the judgment the allowance of punitive damages as determined by this Court under issue 3.

Affirmed in part and reversed in part.

Robertson, J., Concurs;

Lowdermilk, J., Dissents with opinion.

## DISSENTING OPINION

LOWDERMILK, J. — After carefully studying the majority opinion I find that it is necessary for me to dissent to that part of the majority opinion which precluded Chris' recovery of punitive damages.

When an insured person dies, the insurance company has a duty to pay, within a reasonable time, the proceeds of the policy to the proper beneficiary or to seek interpleader where the proper beneficiary cannot be safely ascertained. In the case at bar Farm Bureau did neither. Farm Bureau, fully knowing that the money belonged to someone else, kept possession of the proceeds of the policy, an amount in excess of $20,000, and used that money for its own benefit until such was tendered to the clerk of the court in March, 1974. Farm Bureau knew that Chris' murder trial would be a protracted affair and that it would probably take several months before judgment could be rendered. It also knew that even if Chris was convicted of wrongfully and intentionally killing Robert in a criminal trial, it still would have been possible for her to recover the proceeds in the event that the jury in a civil trial had found that she did not wrongfully and intentionally kill Robert.[1] Farm Bureau also knew that Chris' acquittal in the criminal trial was not determinative of her right to recover the proceeds of the policy.[2]

---

1. See *Beene v. Gibraltar Industrial Life Ins. Co.* (1945), 116 Ind.App. 290, 63 N.E.2d 299.

2. See *National City Bank of Evansville v. Bledsoe* (1957), 237 Ind. 130, 144 N.E.2d 710.

Therefore since Farm Bureau knew the outcome of Chris' criminal trial would have had no determinative effect upon her right to recover the proceeds of the insurance policy, the jury could have reasonably inferred that Farm Bureau intended to keep the proceeds, which it knew belonged to someone else, for its own use until Chris or Robert's estate sued Farm Bureau to obtain the proceeds. Although Farm Bureau assets that it had intended to file an interpleader action in early 1974, the jury could have reasonably inferred from Farm Bureau's dilatory conduct that Farm Bureau did not intend to seek interpleader until after one of the claimants had brought suit against Farm Bureau.

In light of Farm Bureau's long delay in seeking interpleader (July, 1973 to March, 1974), a delay which Farm Bureau obviously knew worked to its benefit and to the true beneficiary's detriment, we cannot say that the trial court erred in allowing the jury to weigh the evidence and determine whether or not such evidence constituted fraudulent and oppressive conduct on the part of Farm Bureau. The jury was the trier of fact. Evidence, based upon the theory of punitive damages contained in Chris' amended complaint, was presented to the jury. As the trier of fact the jury weighed the evidence, judged the credibility of the witnesses and concluded that Farm Bureau's conduct was oppressive and not in good faith.

As an appellate court, we cannot weigh the evidence or judge the credibility of witnesses. See *Monumental Life Insurance Company v. Hakey* (1976), 171 Ind. App. 56, 354 N.E.2d 333. If there is any evidence from which an inference can reasonably be drawn to support the verdict, it is our duty to affirm. See *Monumental Life Insurance Company v. Hakey, supra.*

It can be observed that: Chris filed a complaint seeking to recover the proceeds of the policy, alleging bad faith and fraudulent and oppressive conduct on the part of Farm Bureau, and seeking punitive damages. The evidence at trial showed that Chris was tried and acquitted for the murder of Robert. Farm Bureau neither paid the life insurance proceeds to Chris, the primary beneficiary, nor sought interpleader when it was apparent that the deserving beneficiary could not be ascertained without litigation or agreement, but rather retained the amount of the proceeds for its own use for more than seven

months after Robert's death and sought interpleader only after Chris brought suit against Farm Bureau. Farm Bureau could easily have removed itself from future litigation in this matter by seeking interpleader as soon as it became apparent that competing claims for the proceeds were likely to arise. Farm Bureau's delay in seeking interpleader was purposeless, except that it gave Farm Bureau extended use of the proceeds. With the evidence being in conflict it was a question of fact to be determined by the jury whether Farm Bureau's dilatory conduct amounted to fraudulent, oppressive, or bad faith conduct. The jury, having been properly instructed on the issue of punitive damages, determined that Farm Bureau was guilty of fraudulent or oppressive conduct or bad faith and that under the facts of this case an assessment of punitive damages was proper.

In light of the evidence and reasonable inferences which can be drawn therefrom, it cannot be said, as a matter of law, that the evidence was insufficient to support the verdict concerning punitive damages or that the court erred in overruling Farm Bureau's motion for judgment on the evidence.

The majority opinion stands for the proposition that where the primary beneficiary of an insurance policy is charged with causing the wrongful and intentional death of the insured, and the proper beneficiary cannot be immediately ascertained, then the insurance company need not file interpleader and tender the proceeds into court, but may retain the proceeds indefinitely, or at least until one of the beneficiaries sues the insurance company for the proceeds. Then after having had the use of that money for several months longer than if interpleader had been filed when it first became unclear as to whom the proceeds properly belonged, the insurance company need only wait until it is sued by one of the beneficiaries, file interpleader and escape further responsibility. The inequities inherent in such a procedure are obvious. Such procedure encourages dilatory conduct on the part of insurance companies which works to the advantage of the insurer and to the disadvantage of the beneficiary.

The majority opinion states that Farm Bureau's delay in filing interpleader must be calculated from the date of Chris' acquittal (November 22, 1973) until Chris filed suit against Farm Bureau (January

28, 1974). Such statement is without legal foundation. The outcome of Chris' criminal trial had no determinative effect upon her right to receive the proceeds to Robert's life insurance policy. See *Beene, supra,* and *National City Bank of Evansville, supra.* It would have been as economically unsound for Farm Bureau to have paid Chris the proceeds after her acquittal as it was before. Nothing was accomplished by waiting until after Chris' trial. The proper time for Farm Bureau to have filed its interpleader would have been when Chris was first charged with murdering Robert (July 1973). That is when it became doubtful as to who the proper beneficiary was. Therefore, Farm Bureau could properly have been charged with delay in filing interpleader from July 1973 until interpleader was actually filed in March 1974.

The majority opinion states:

"The imposition of punitive damages would in effect require the insurer to immediately file an interpleader when learning that the decedent was murdered. That would no doubt have been followed by a continuance until the criminal proceedings ended. At that time the civil action could continue."

This is not correct. The imposition of punitive damages in the case at bar would not require an insurer to file an interpleader upon learning that the insured was murdered, but rather it would require an insurer to file an interpleader within a reasonable time after the primary beneficiary became a suspect in causing the wrongful and intentional death of the insured. Any civil litigation which followed the filing of an interpleader would exist totally apart from any criminal litigation which might transpire. No continuance would be necessary, and all litigation would terminate at an earlier date.

The majority is correct in stating that, where punitive damages based on a contract are in issue, it is not necessary to establish all the elements of an independent tort, but rather it is necessary to show that elements of fraud, malice, gross negligence, or oppression mingle in the controvery and that the public interest must be served by the deterrent effect of the punitive damages. See *Vernon Fire & Casualty Insurance Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173 and *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845.

In the case at bar the evidence reveals that Farm Bureau retained and used several thousand dollars of someone else's money for more than seven months. Farm Bureau knew that Chris' criminal trial would have had no effect upon her right to receive the proceeds. It knew that litigation was inevitable. Without utilizing the procedural vehicle which has been provided to stakeholders so that they can tender the money and withdraw from any future litigation, Farm Bureau, for some unexplained reason, retained the proceeds for its own use until suit was brought against it to recover such proceeds.

Such behavior, though arguably not sufficient to establish the existence of an independent tort, evinces substantial elements of fraudulent, malicious, grossly negligent, oppressive, and bad faith conduct. Such elements mingle in the controversy, and it should be up to the jury to determine whether such elements are present in such force so as to require the assessment of punitive damages. Certainly it would be in the public interest to deter an insurance company from using money which rightfully belonged to another to promote its own well being.

In the case at bar the jury determined from the conflicting evidence that Farm Bureau's conduct was sufficiently heinous to warrant an assessment of punitive damages. To say, as the majority opinion does, that the evidence is insufficient, as a matter of law, to support an award of punitive damages is to ignore certain evidence which was presented at trial. It is my opinion, therefore, that Farm Bureau's motion for judgment on the evidence was properly denied and that the jury's award of punitive damages should be affirmed.

NOTE — Reported at 375 N.E.2d 601.